IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BROOKSIDE GROUP, LLC,                  :
                                       :
                                       :
        Plaintiff,                     :
                                       :
v.                                     :        CIVIL ACTION NO.
                                       :        1:18-CV-1005-AT
CARIS HEALTHCARE, LP,                  :
                                       :
                                       :
        Defendant.                     :

## **ORDER**

This matter is before the Court on the Plaintiff's Motion for Partial Summary Judgment as to Liability [Doc. 102], Plaintiff's Motion for Leave to File Matters Under Seal [Doc. 104], Defendant's Motion for Summary Judgment [Doc. 114], Defendant's Motion for Leave to File Briefs in Excess of Page Limits [Doc. 132], and Plaintiff's Motion for Leave to File Sur-Reply [Doc. 145].

Plaintiff's Motion for Leave to File Matters Under Seal **is GRANTED in part** and **DENIED in part**. [Doc. 104.]

Plaintiff's Motion for Partial Summary Judgment as to Liability is **DENIED**. [Doc. 102.]

Defendant's Motion for Summary Judgment is **GRANTED in PART** as to both counts in Plaintiff's Complaint, and **DENIED in PART** as to the Doctrine of Unclean Hands. [Doc. 114.]

Defendant's Motion for Leave to File Briefs in Excess of the Page Limits is **GRANTED in part** as to its Motion for Summary Judgment (Doc. 114), but **DENIED in part** as to its Response to Plaintiff's Motion for Partial Summary Judgment (Doc. 124). [Motion, Doc. 132.]

Plaintiff's Motion for Leave to File Sur-Reply is **DENIED**. [Doc. 145].

I.    **Miscellaneous Motions**

    **a. Motion for Leave to File Matters Under Seal**

In its Motion for Leave to File Matters Under Seal, Plaintiff seeks leave to file 18 different exhibits under seal. (Motion, Doc. 104.) Defendant filed opposition as to Exhibits A (Non-Disclosure Agreement), B (Business Associate Agreement), and F (Email chain), noting that Exhibits A and B are already filed on the open docket, and Exhibit F was sent before the signing of the Non-Disclosure Agreement and the Plaintiff cannot claim therefore that the email contains information which is "confidential or proprietary as a matter of law." (Response, Doc. 120 at 2–3.) Defendant does not object to the filing of the remaining exhibits under seal, though it notes that it is not conceding that any of those documents are confidential as a matter of law. (Response, Doc. 120 at 1.) In its Reply, Plaintiff agrees that Exhibits A and B need not be filed under seal, but claims that the email chain in Exhibit F contains information proprietary to its business. (Reply, Doc. 122.) Plaintiff's

Motion for Leave to File Under Seal is **GRANTED** as to Exhibits 1, 2, 3, 6, 7, 8, C, F, G, H, K, L, M, N, O, and P[1] and **DENIED** as to Exhibits A and B[2]. [Doc. 104.]

### b. Defendant's Motion for Leave to File Briefs in Excess of the Page Limits

On July 27, 2020, Defendant filed a 39-page Motion for Summary Judgment. (Caris MSJ, Doc. 114.) On August 24, 2020, Defendant filed a 43-page Response to Plaintiff's Motion for Summary Judgment. (Response, Doc. 124.) It was not until September 3, 2020 that Defendant got around to filing a Motion for Leave to File Briefs in Excess of the Page Limits. (Motion, Doc. 132.) Of course, by this time, Plaintiff had already filed its Response to the Motion for Summary Judgment (adhering to the page limitations while still responding to all of Defendant's excessive briefing), and its Reply in support of its own Motion for Summary Judgment was forthcoming. Defendant says that there is good cause to allow the extensions nunc pro tunc, because it "has attempted to be as concise as the issues reasonably permit and have expressly tailored its briefs to the particular facts and issues under consideration." (Doc. 132 at 2.) In other words, Defendant says that it tried but it just couldn't manage to pare its briefs down any further. Defendant also tries to push blame onto the Plaintiff, claiming it needed extra pages because Plaintiffs "[left] out key details regarding its repeated efforts to get Caris to hire Brookside and its own breach of the non-disclosure agreement." (Doc.

---

[1] Docs. 103-2, 103-2, 103-4, 103-5, 103-6, 103-7, 103-10, 103-11, 103-12, 103-13, 103-14, 103-15, 103-16, 103-17, 103-18, 103-19.
[2] Docs. 103-8, 103-9.

132 at 2.) At no point does Caris address why it took more than a month after the filing of its Motion for Summary Judgment to request this page extension.

Frankly, the Court would normally be inclined under these circumstances to deny the motion and simply strike the excess pages from both briefs. After all, this is not Defendant's first time dodging compliance with the rules of this Court. (*See* Order, Doc. 53 (denying Motion to Compel for failure to comply with the Court's Standing Order).) But, as Plaintiff has already responded in full to the Defendant's Motion for Summary Judgment – while remaining within the page limitations – the Court will allow the extension for that brief (Doc. 114) only. However, the length of Defendant's Response (Doc. 124) is flatly excessive, and unnecessary. Accordingly, as a matter of fairness, the Court will not allow the page extension for the Response, and the Court will not consider anything beyond the required page limit in the Response. *See Mitchell v. Dixie Transp., Inc.*, No. 1:16-CV-00336, 2019 WL 6137488, at *1 (N.D. Ga. Nov. 19, 2019).

Defendant's Motion for Leave to File Briefs in Excess of the Page Limits is **GRANTED in part** as to its Motion for Summary Judgment (Doc. 114), but **DENIED in part** as to its Response to Plaintiff's Motion for Partial Summary Judgment (Doc. 124). [Motion, Doc. 132.]

### c. Plaintiff's Motion for Leave to File Sur-Reply

On October 1, 2020, Plaintiff filed its Motion for Leave to File Sur-Reply [Doc. 145]. The proposed Sur-Reply serves to inform the Court of Plaintiff's belief that the rules do not allow a party to file a Reply to its own Statement of Additional

Material Facts. (Proposed Sur-Reply, Doc. 145-1.) Plaintiff argues that while a Reply to a Statement of Material Facts is allowed, a Reply to a Statement of *Additional* Material Facts is not. Beyond that, the Sur-Reply argues that the Reply is also inappropriately argumentative and not in conformity with this Court's Standing Order or the Local Rules of this Court. (*Id.*)

The Court is skeptical that the rules forbid the filing of a Reply in the case of a Statement of Additional Material Facts when they clearly allow for filing of the same in relation to the initial Statement of Material Facts. Rather, it is more likely that the rules either do not contemplate it at all or that they allow it under the same rubric that they allow it for the Statement of Material Facts. *See* LR 56.1(B) N.D. Ga.; Standing Order, Section III(i). For this reason, Plaintiff's motion is **DENIED**, although this Court notes the Plaintiff's concerns regarding the substantive nature of Defendant's filing. [Doc. 145.]

### d.   Discovery Disputes

The Parties have been in a protracted discovery dispute since at least August 12, 2019, when they filed with the Court a Consolidated Joint Discovery Statement. (Doc. 90.) The dispute stems from certain items in Plaintiff's Fourth Request for Production of Documents which sought information relating to the time period March 1, 2017 to the present, and "which were designed to acquire information necessary for the calculation of Brookside's damages." (Doc. 90 at 1–2.) The information sought was essentially the updated version of what Optum had shared with Brookside prior to the November 2nd presentation discussed infra. (Doc. 90

at 2.) Because the Court is ruling against Plaintiff in this Order, including on its claim of unjust enrichment, the dispute is now **MOOT**, and the Court will not order Defendant to produce the requested data.

## III.   Procedural History

On March 8, 2018, Plaintiff, Brookside Group, LLC ("Brookside" or "Plaintiff") filed its Complaint (Doc. 1), alleging that Defendant, Caris Healthcare, LP ("Caris" or "Defendant") violated a Non-Disclosure Agreement and used Plaintiff's confidential and proprietary information to unjustly enrich itself. (Complaint, Doc. 1.) To that end, the Complaint includes just two counts: Breach of Non-Disclosure Agreement (Count I); and Unjust Enrichment (Count II). (Complaint, Doc. 1.)

Defendant timely filed its Answer on April 2, 2018. (Answer, Doc. 5.) Nearly a year later, after commencement of discovery, the Defendant filed with the Court an "Amended Answer with a Counterclaim," although no counterclaim was actually made by the Defendant[3]. (Amended Answer, Doc. 63.) Rather, the Defendant amended the answer only for the purpose of adding the affirmative defense of unclean hands, and did not state any counterclaim. (Doc. 63.) Following completion of discovery, on July 20, 2020, Plaintiff filed its Motion for Partial Summary Judgment as to Liability (Doc. 102), and Defendant filed its own Motion for Summary Judgment on July 27, 2020 (Doc. 114).

---

[3] The caption generated on the case's electronic docket indicates – wrongly – that the parties are also parties in counterclaim. The Clerk of the Court is **DIRECTED** to correct the caption of the case to reflect that there is no counterclaim in this matter.

## IV.   Background Facts[4]

### a.   The Parties

Brookside is an LLC with two members: Jim Benjamin, who is also the CEO, and Rob Paulsson, who Mr. Benjamin described as handling "all of the billing, accounting. Any true consulting work that we do, he's very involved in." (Jim Benjamin Depo., Doc. 111 at 11–12. (sealed).) Brookside does not have any other employees. (Jim Benjamin Depo., Doc. 111 at 15 ("Other than Rob Paulsson and myself, [Brookside] ha[s] no employees."). In his deposition, Jim Benjamin described Mr. Paulsson has having "[z]ero" involvement in the events which underpin this case. (*Id*. at 11–12.) Brookside "provides proprietary services to hospices and other health care providers by examining the hospices' pharmacy spending practices and renegotiating hospice contracts with pharmacy benefit managers." (Complaint, Doc. 1 at 2.)

Jim Benjamin's brother, Peter Benjamin, was neither an employee nor member of Brookside, but he operated as a representative of or consultant[5] to Brookside to "introduce[] [Brookside] to hospice CEOs and CFOs that he had long-standing relationships with, [and Brookside] had an arrangement that compensated him for doing so." (Jim Benjamin Depo., Doc. 111 at 15.)

---

[4] The factual description herein does not constitute actual findings of fact. The Court derives the factual description below from the evidence in the record. Any fact referred to by the Court is undisputed, unless otherwise indicated.

[5] In his own deposition, Peter Benjamin explained that he works full-time as a consultant in the company he formed with his wife, called the Huntington Consulting Group, and that his work for Brookside was conducted through the Huntington Consulting Group. (Peter Benjamin Depo., Doc. 112 at 5 (sealed).)

Caris operates hospices throughout the United States. (Complaint, Doc. 1 at 2.) During the time period relevant to the events in this case, Norman McRae ("McRae") was the CEO of Caris, and Bonita Ledgerwood was the Vice President of Patient Care for Caris. (McRae Depo., Doc. 82 at 21–22 (sealed); Ledgerwood Depo., Doc. 108 at 15–16 (sealed).) During this period of time, Caris was in the process of transitioning McRae out of his role as CEO, and by February of 2017, Saylor was the CEO of Caris, and McRae had transitioned to his new role as Managing Director. (Saylor Depo., Doc. 81 at 21; McRae Depo., Doc. 82 at 27–28.) In 2014, Caris entered into a five-year contract with a Pharmacy Benefit Manager called Optum Hospice Pharmacy Services ("Optum").[6] (Guay Depo., Doc. 106 at 27.) Caris's contract with Optum was built on a "fee-for-service pricing model" in which Optum gave Caris "a set discount off of the price of their [medication] brands and generics, and then [Optum] also provided them with clinical services, including a dedicated pharmacist, and all of their pricing was bundled together." (Guay Depo., Doc. 106 at 23–24.) During the period of time relevant to this case, Caris and Optum eventually renegotiated their contract using a "pass-through model" in which Caris received "the direct contracted rate that Optum has negotiated with each pharmacy .... and then [Optum] charge[s] an admin fee on the side of that, in a different bucket, and that covers Optum's operational fees." (Guay Depo., Doc. 106 at 46.)

---

[6] Optum was at one time known as Hospiscript, and is referred to both ways throughout the materials provided in this case. (*See, e.g.*, Guay Depo., Doc. 106 at 12–14.) The Court will refer to the company as "Optum" throughout this Order.

### b.   Background

Peter Benjamin and Norman McRae had known each other for a long time through their involvement in the hospice industry, and had a friendly rapport. (McRae Depo., Doc. 82 at 44.) In May 2016, Peter Benjamin emailed McRae "about an opportunity to do business with [Brookside.]" (McRae Depo., Doc. 82 at 44.) Specifically, Peter Benjamin expressed that Brookside would be able to analyze Caris's pharmacy spending and help Caris negotiate a better contract with Optum. (Peter Benjamin Depo., Doc. 112 at 5; McRae Depo., Doc. 82 at 44–46.) In the ensuing conversations which occurred over phone and email, Peter Benjamin told McRae that Brookside could provide a free initial consultation that would include a comprehensive analysis of Caris's pharmacy costs and a report indicating whether Brookside believed it could reduce those costs through its proprietary algorithmic analysis. (Peter Benjamin Depo., Doc. 112 at 6; Peter Benjamin Depo. Exh. 1 (email), Doc. 112-1 at 4–5 ("We would sign a NDA and you would share (or have your vendor share) data with us. My brother and his partners will come back to you with a comprehensive analysis of the opportunity. No obligation on your part and virtually no work on your part."); *see also* McRae Depo., Doc. 82 at 49–50; Jim Benjamin Depo., Doc. 111 at 29 ("The analysis that we do for our clients, in general, is free. They don't pay -- they don't pay for the analysis. However, they can't use it unless they move forward with us contractually.").) In one email to McRae dated August 23, 2016, Peter Benjamin says, "As we discussed, us doing the analysis for you is a great piece of "free consulting work" whatever you decide to

do moving forward[.]" (McRae Depo. Exh. 3, Doc. 82-3 at 1–2. (internal quotations in original).) Then, a couple of weeks later on September 14, 2016, Peter Benjamin again emailed McRae, saying, "Hey; free consulting – when did you EVER think you would hear me pitch that???" (*Id.* at 1 (punctuation and capitalization in original).)

In September, 2016, Caris agreed to allow Brookside to perform a free consultation on the Optum contract, and the Parties executed a two-page Non-Disclosure Agreement ("NDA"). (NDA, Doc. 103-8 at 2–3.) The Parties also executed then a "Business Associate Agreement" which was to insure compliance with the Health Insurance Portability and Accountability Act of 1996. (Jim Benjamin Depo., Doc. 111 at 35.)

On October 4, 2016, Bonita Ledgerwood directed Optum through email to provide the necessary data to Brookside, informing Optum that "[a]s part of our on-going forecast review process, we are drilling down into our significant cost items and focused our attention on our pharmacy spend." (Ledgerwood Depo., Doc. 108 at 24–25; McRae Depo. Exh. 7, Doc. 82-7 at 1 (Ledgerwood email to Optum).) Around October 5, 2016, Jim Benjamin had one or more phone calls with Optum to discuss precisely what information Brookside needed from Optum. (Jim Benjamin Depo., Doc. at 74–76.) Then, on October 5, 2016, Jim Benjamin received an email from Natalie Swider, a Senior Account Executive for Optum assigned to the Caris account, saying that she heard Brookside was going to work with Caris, and seeking to introduce Jim Benjamin to Laurie Guay, the lead person on the

Caris account for Optum. (Swider Depo., Doc. 109 at 18–19; Jim Benjamin Depo. Exh. 9, Doc. 111-9 at 2 (Swider email).) Throughout the middle of October 2016, Caris and Optum arranged for Brookside to receive the information they needed to perform their analysis.[7] (Jim Benjamin Depo., Doc. 111 at 74–77; Lance Copeland Depo., Doc. 105 at 26–26, 34–35; *see also* Swider Depo., Doc. 109 at 19–22 (describing nature of interactions with Brookside in past encounters).)

At some point, at least as early as October 16, 2016, Jim Benjamin forwarded some or all of the information provided to him by Caris and Optum to a company called ST Health Group Consulting ("ST"). (Jim Benjamin Depo., Doc. 111 at 16, 43–48 (sent Caris/Optum contract, invoices, dispense detail, and census data); Jim Benjamin Depo. Exh. 5, Doc. 111-5 (several emails with attachments sent from Jim Benjamin to ST).) Jim Benjamin testified during his deposition that he considers ST to be part of Brookside, although in another portion of his testimony, he explained that Brookside and ST are in fact wholly separate companies with no overlap of ownership or employees-in-common. (Jim Benjamin Depo., Doc. 111 at 15 ("Other than Rob Paulsson and myself, [Brookside] ha[s] no employees."), 16 (explaining that Brookside and ST do not have any ownership interest in one another), 162 ("Well, I consider ST, in our agreement, Brookside.").) Brookside never informed Caris that it would be sending information to ST, and ST did not

---

[7] In the end, Brookside reviewed "nine months of invoices and over 85,000 individual dispensing decisions, using its proprietary system, tools and databases." (Jim Benjamin Depo., Doc. 111 at 16.)

also sign a nondisclosure agreement with Caris. (Jim Benjamin Depo., Doc. 111 at 33, 50.)

On October 24, 2016, Jim Benjamin sent an email to Natalie Swider at Optum, saying, "I would like to spend some time with you walking through our pricing analysis." (Jim Benjamin Depo. Exh. 9, Doc. 111-9 at 2 (Swider email).) Jim Benjamin testified that in the days following this email, he had a phone call with Natalie Swider and Laurie Guay from Optum during which he gave them a "high level" walk through of Brookside's pricing analysis as it pertained to Caris and Optum. (Jim Benjamin Depo., Doc. 111 at 75–77.) On October 26, 2016, Jim Benjamin emailed McRae to inform him that Brookside had "completed its cost analysis and savings assessment of the current PBM agreement between Caris and [Optum]. ... The net of our findings is that we believe that there is a tangible savings opportunity for Caris." (Jim Benjamin Depo. Exh. 13, Doc. 111-13.)

On November 2, 2016, Brookside gave an "online presentation" to Caris, explaining its findings and how it thought they could save Caris "millions of dollars by renegotiating its contract." (Jim Benjamin Depo., Doc. 111 at 19, 91.) Brookside presented various pieces of data to Caris in support of its ultimate conclusion that Optum was charging through the contract significantly above-market fees sand costs to Caris.

After this presentation, Caris began to do some further research and learn more about its pharmacy costs. This research review included Caris top executives Saylor and Ledgerwood meeting with other Pharmacy Benefit Managers to get

information on various pricing models. (Ledgerwood Depo., Doc. 108 at 51–54; 61–64; McRae Depo., Doc. 82 at 131–132; Saylor Depo., Doc. 81 at 157–58.)

Shortly after the online presentation, Brookside sent draft versions of its Master Services Agreement ("MSA") and Statement of Work ("SOW") to Caris. (Jim Benjamin Depo., Doc. 111 at 126–127). The MSA reflects Brookside's preferred terms as to the services, length of engagement, renewal, and other similar broad aspects of a potential contract between the Parties. (MSA, Doc. 103-10 at 4–6.) The SOW then gets into a more granular review of the responsibilities of each party. (SOW, Doc. 103-10 at 2–3.) For instance, the SOW lays out the work that Brookside would be performing in five general steps:

> 1.1 Brookside will review and analyze pharmacy benefit manager ("PBM") and pharmacy contracts for the purpose of identifying and recommending opportunities for pricing rate reductions.

> 1.2 Brookside will analyze Client's actual purchase and invoice data (volume, spend, NDC's, etc) to quantify all savings opportunities and collaborate with Client to develop strategies to achieve best-in-class pricing and contract terms from PBM's and pharmacies.

> 1.3 Brookside and Client will work together to develop a unique strategy to negotiate with the PBM's and pharmacies.

> 1.4 Brookside will analyze and quantify PBM and pharmacy proposals and collaborate with Client and PBM and pharmacies to implement new contracts.

> 1.5 Brookside will audit and provide refund filing services for all PBM and pharmacy invoices on a quarterly basis.

(SOW, Doc. 103-10 at 2.) The SOW also included Brookside's pricing, termination, and renewal terms. (*Id.* at 2–3.) After transmitting the MSA and SOW, Brookside and Caris engaged in some discussions and negotiations about Brookside's price. (McRae Depo. Doc. 82 at 120–121; Jim Benjamin Depo., Doc. 111 at 125–127; Saylor Depo., Doc. 81 at 66–67; Peter Benjamin Depo., Doc. 112 at 13.) The Court notes that neither the MSA nor the SOW were ever signed or executed, leaving the NDA as the sole agreement guiding the relationship between the Parties.

On November 15, 2016, McRae emailed Carna Triftshauser, an Optum Account Manager, along with Ledgerwood and Saylor to say, "[w]e need to talk to you about a conversation we are having with a company called [Brookside]." (Triftshauser Depo. Exh. 2, Doc. 110-2 at 1; Triftshauser Depo., Doc. 110 at 22–23.) Later, on November 29, 2016, McRae emailed Peter Benjamin, telling him,

> Peter, our conversations have caused us to pause and investigate our contract with [O]ptum. Specifically we are waiting on them to get us info on the amount of consulting services to us. They have been our long term partner so u [sic] can't blame them for trying to keep the relationship free of another party. They are also in the process of replacing our long term pharmacist. Thank you for starting conversations – don't know where we will end up.

(Exh. G, email, Doc. 103-12 at 5.) In his same day response to this email, Peter Benjamin said, among other things,

> Bottom line: your contract [with Optum] is considerably above market rates and based upon knowledge we have that you don't we are confident that [Optum] would close the gap. You simply didn't know that until you were the beneficiary of our intellectual property.

> ...
> Norman: [Optum has] been taking advantage of you and
> your organization and if it wasn't for us, you simply
> wouldn't know that.

(*Id.* at 4.) On November 30, 2016, McRae responded to Peter Benjamin, saying,

> First problem is that we don't have a standard contract
> with Optum and I didn't recall this until after this
> conversation started. Years ago we negotiated to have
> pharmacy consult services included vs. [sic] paying
> separately for them. ...The issue as Paul and I see it is that
> if we re-negotiate we could end up paying for the
> pharmacist separately. We then would not be saving
> money but rather paying Optum outside of the contract
> for the on-call 24 hour pharmacist consult. Out cost of
> drugs would go down and cost of consult would go up. ...
> The second problem is ... that Brookside was offering
> contractual changes only. We thought that your savings
> were based on utilization of NDC codes at the point of
> acquisition and your ability to influence those decisions
> with pharmacies. Optum counters that this is very
> difficult to do and frankly challenges the idea that this
> would provide much savings in reality. ... The results call
> told us that we don't have a clinical utilization problem
> but rather need to get more discount from Optum.

(*Id.* at 3–4.) Later that same day, Peter Benjamin replied in a relatively long email,

explaining that Caris had not fully understood what Brookside was proposing, nor

how Brookside's pricing model already accounts for many of Caris's concerns. (*Id.*

at 2–3.)

On December 20, 2016, Jim Benjamin, McRae, Saylor, and Ledgerwood had

a phone conference to discuss "[h]ow the process of partnering with Brookside

work[s]" and specifically how savings would be measured in a partnership with

Brookside. (Jim Benjamin Depo., Doc. 111 at 152–153.) Over the next week, Jim

Benjamin twice emailed McRae, Saylor, and Ledgerwood providing two example spreadsheets, allegedly showing "the type of monthly savings support we include with each Brookside invoice[,]" and helping to "delineate what we do for high level reporting purposes versus the actual work associated with the data." (Exh. I, Doc. 102-21 at 2–3.) Around the same time, Ledgerwood received responses from at least one of the other Pharmacy Benefit Managers to whom she had reached out to learn more about the services provided by that company. (*See* Ledgerwood Depo., Exh. 12, Doc. 108-12 (HospiceMed emails).)

On January 10, 2017, Peter Benjamin emailed McRae to follow up. (Exh. K, Doc. 103-14 at 3.) The next day, McRae responded, saying,

> Peter, we have our last of the three reference calls tomorrow. We had a meeting with Optum here in Knoxville this week and are awaiting their response. We have also met with another PBM and have another scheduled. I don't know what the outcome will be but we are diligently looking at our pharmacy spend.

(*Id.* at 3.) Peter Benjamin responded to this with another email pitching Brookside, and expressing his belief that Caris would not even know to look at its pharmacy spending were it not for Brookside's input. (*Id.* at 2–3.) McRae then replied on January 12, 2017, making it clear that Caris would not be contracting with Brookside on Brookside's proposed terms, saying,

> Although you are getting glowing references the Brookside customers all say they wish they didn't have to write Brookside a check every month. What we have learned is that there are other PBMs offering a pass-through pricing model, so transparency is creeping into the market. Yes, you led us to think in that direction, but

> you called me. I didn't call Brookside asking for help. We
> don't know what we are going to do yet, but I don't think
> we will sign anything for 3 years and 30 %.

(*Id.* at 2.)

In the latter half of January 2017, Caris and Optum continued discussions about their contract, and Optum explored the possibility of changing the pricing model in the Caris contract. (Saylor Depo., Exh. 20 (Jan. 20, 2017 Guay email to Saylor), Doc. 81-20 ("[Optum] talked about [Caris's] request around potentially changing the pricing model that Caris is currently under in our existing contract. This is now under review by our executive team, and once we have further direction around our options, we will reach back out.").) When Saylor updated McRae that Optum was reviewing the contract, McRae responded, "[t]ell them Brookside is anxious to get involved so they should hurry." (*Id.* (Jan. 20, 2017 McRae email to Saylor).)

On February 16, 2017 Peter Benjamin emailed McRae, seeking to set up a phone call. (Peter Benjamin Depo. Exh. 25, Doc. 112-25 at 2.) A week later, on the 23rd, McRae responded, telling Peter Benjamin, "I think [Saylor] is who you need to talk to." (*Id.*)  Then, on February 27, 2017, Peter Benjamin emailed McRae, recounting their long relationship and explaining that he would not have handled the pitch to Caris the same way had he been dealing with Saylor instead of McRae. (*Id.* at 1–2.) Specifically, he wrote,

> If [Saylor] hadn't liked the "terms" of engagement and if
> he was unwilling to execute the industry standard
> documents that I would have sent him (and that I did

send you but didn't require you to sign), well, then we never would have performed any work, you wouldn't know that your current vendor is taking advantage of you (actually "screwing you" would be more accurate) and you wouldn't be about to save a bunch of money.

But since I have known you for 25 years, I didn't require you to execute the documents. And now you are likely to save a bunch of money ONLY because we did the work, we shared our work with you AND that [Optum] unequivocally knows our work and analysis is real and compelling. As a result, [Optum] is going to renegotiate a contract that you wouldn't have touched for two more years.

(Doc. 112-25 at 1–2.)

McRae emailed Peter Benjamin on March 1, 2017, informing him that "[Saylor] did sign a new agreement with Optum today and if it doesn't work out you will be the first person he calls." (Peter Benjamin Depo. Exh. 25, Doc. 112-25 at 1.) He also thanked Brookside for "bringing this information to our attention[,]" and observed that Caris was apparently "one of the last few hospices that Optum had not converted to pass thru [sic]." (*Id.*) Through the renegotiation, the contract was changed from a "fee-for-service pricing model" to a "pass-through model" in which Caris received "the direct contracted rate that Optum has negotiated with each pharmacy .... and then [Optum] charge[s] an admin fee on the side of that, in a different bucket, and that covers Optum's operational fees." (Guay Depo., Doc. 106 at 23–24, 46.) The "pass-through model" was first pitched to Caris by Laurie Guay in 2014 during the negotiation of the original contract. (Guay Depo., Doc. 106 at 32–33 ("[D]uring their 2014 contract negotiation, I had tried to put them

into a pass-through model. It's more transparent. ... And at the time they weren't comfortable with that. They wanted a consistent discount, which they were receiving under the fee-for-service pricing.").)

## VI.   Standard of Review

### a.   Summary Judgment Standard

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment.") (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931–32 (7th Cir. 1995) (emphasis in original)). A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The moving party need not positively

disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324–26. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

### b.    Contract Interpretation

The Non-Disclosure Agreement entered into by the Parties dictates that the "Agreement shall be governed by the laws of Georgia." (NDA, Doc. 103-8 at 3.) In Georgia, the construction or interpretation of the terms of a contract is initially a question of law for the court and therefore may be resolved on summary judgment. O.C.G.A. § 13-2-1. Where any matter of disputed fact is involved, the jury should determine the factual issue. *Id.* Where the terms of the contract are clear and unambiguous, the court must enforce the contract according to its terms and look to the language of the contract alone to determine the intention of the parties. *Health Serv. Ctrs., Inc. v. Boddy*, 359 S.E.2d 659, 661 (Ga. 1987) (citing *DeLong v. Cobb*, 111 S.E.2d 89 (Ga. 1959)); *Duffett v. E & W Props., Inc.*, 430 S.E.2d 858, 859 (Ga. Ct. App. 1993). If the court is unable to resolve the ambiguity by applying rules of construction, a jury must decide the meaning of the contract. *Travelers Ins. Co. v. Blakey*, 342 S.E.2d 308, 309 (Ga. 1986); *Caswell*, 527 S.E.2d at 584; *Duffett*, 430 S.E.2d at 859; *Transam. Ins. Co. v. Thrift-Mart, Inc.*, 285 S.E.2d 566, 571 (Ga. Ct. App. 1981) ("Contracts, even when ambiguous, are to be construed by the court and no jury question is presented unless after application of applicable rules of construction an ambiguity remains.").

The existence or non-existence of an ambiguity in a contract is a question of law for the court. *McLean v. Cont'l Wingate Co., Inc.*, 442 S.E.2d 276, 278 (Ga. Ct. App. 1994); *Kusuma v. Metametrix, Inc.*, 381 S.E.2d 322, 323 (Ga. Ct. App. 1989); *Salvatori Corp. v. Rubin,* 283 S.E.2d 326, 329 (Ga. Ct. App. 1981). Ambiguity arises when the language of a contract may be fairly understood in more than one

way. *E.g.*, *Caswell v. Anderson*, 527 S.E.2d 582, 584 (Ga. Ct. App. 2000); *Verret v. ABB Power T&D Co., Inc.*, 515 S.E.2d 435, 436 (Ga. Ct. App. 1999); *CareAmerica, Inc. v. S. Care Corp.*, 494 S.E.2d 720, 722 (Ga. Ct. App. 1997); *see also Coleman v. Arrington Auto Sales & Rentals*, 669 S.E.2d 414, 416 (Ga. Ct. App. 2008) ("Ambiguity exists where the words used in the contract leave the intent of the parties in question—i.e., that intent is uncertain, unclear, or is open to various interpretations."). Conversely, contract language is unambiguous if it is capable of only one reasonable interpretation. *Caswell*, 527 S.E.2d at 584. If ambiguity in a contract cannot be resolved by application of the rules of contract construction, parol evidence may be introduced to explain the agreement, and the question of what was intended by the parties becomes an issue of fact for the jury. *Livoti v. Aycock*, 590 S.E.2d 159, 164 (Ga. Ct. App. 2003) (citing *Kobryn v. McGee*, 503 S.E.2d 630 (Ga. Ct. App. 1998); O.C.G.A. § 13-2-2(1); *Gill v. B&R Intern., Inc.*, 507 S.E.2d 477 (Ga. Ct. App. 1998) (if the court is unable to resolve the ambiguity by applying the rules of construction, the court must submit the issue to a jury); *Verret v. ABB Power T&D Company, Inc.*, 515 S.E.2d 435 (Ga. Ct. App. 1999) (Ambiguity is defined as duplicity or uncertainty of expression.) "The cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction." O.C.G.A. § 13-2-3. A contract should be construed to give effect to

every provision therein, so that no provision is rendered meaningless. *Young v. Stump*, 669 S.E.2d 148 (2008).

### c.   Breach of Contract

The elements of a breach of contract claim in Georgia are (1) a valid contract; (2) material breach of its terms; and (3) resultant damages to the party having the right to complain that the contract has been broken. *See TechBios, Inc. v. Champagne*, 688 S.E.2d 378, 381 (Ga. Ct. App. 2009); *TDS Healthcare Sys. Corp. v. Humana Hosp. Illinois, Inc.*, 880 F. Supp. 1572, 1583 (N.D. Ga. 1995)).

## V.   The Parties' Motions

Plaintiff contends in its Motion for Partial Summary Judgment that it "performed work – a detailed review of Caris' pharmacy spending costs and the Optum contract – with a clear understanding communicated to Caris that once a conclusion of 'we can save you money' was reached that any additional work, analysis or instruction by Brookside was to be compensated." (Plaintiff's MSJ, Doc. 103 at 20–21.) Plaintiff asserts that Caris breached the NDA when "it utilized Brookside's conclusions in its discussions with [Optum] in November 2016[.]" (Doc. 103 at 22.) Plaintiff further asserts that Caris "was unjustly enriched by its use of the analysis and conclusions reached by Brookside to improve the contractual terms Caris had with Optum." (Doc. 103 at 25.) Plaintiff seeks entry of summary judgment as to liability, but not damages.

In its cross Motion for Summary Judgment, Caris argues that "the evidence shows that Caris did not share Brookside's alleged confidential information with

anyone," and that the allegedly confidential information was no longer confidential per the terms of the NDA because it was otherwise available. (Caris MSJ, Doc. 114-1 at 2.) Caris further argues that Brookside has failed to describe the alleged confidential or proprietary information "with particularity sufficient to allow Caris to understand all of the alleged proprietary information that is the subject of the breach of the contract claim." (*Id.*) Lastly, Caris argues that there is simply an absence of evidence to support Brookside's claim for damages. (*Id.*) Caris also seeks summary judgment as to the unjust enrichment claim, saying that such a claim cannot be maintained where "there is a written agreement and when services are performed without the expectation of payment." (Doc. 114-1 at 3.) Caris also asserts the defense of "unclean hands," saying that Brookside cannot assert an unjust enrichment claim here when Brookside first breached the NDA by sending Caris's confidential information to a third party (ST) without permission. (*Id.*)

### a.    The Non-Disclosure Agreement

The NDA is the only actual agreement executed between the Parties. The NDA specifies that it is being entered into by "the Brookside Group … having its place of business in Atlanta, GA and Caris Healthcare … having its place of business at 10651 Coward Mill Road, Knoxville, TN 37931." (NDA, Doc. 103-8 at 2.) The purpose of the NDA was explained this way: "Brookside and [Caris] wish to explore a business opportunity of mutual interest and in connection with this opportunity wishes to execute this Non Disclosure Agreement." (*Id.*) The NDA defined "Confidential Information" as,

> any information disclosed to [sic] by one party to the
> other, either directly or indirectly in writing, orally or by
> inspection of tangible or intangible objects, including
> without limitation documents, business plans, source
> code, software, documentation, financial analysis,
> marketing plans, customer names, customer list,
> customer data. [sic] Confidential Information may also
> include information disclosed to a party by third parties
> at the direction of a Disclosing Party.

(NDA, Doc. 103-8 at 2.) The NDA then clarifies that Confidential Information is

*not*,

> any information which the Receiving Party can establish
> (i) was publicly known and made generally available in
> the public domain prior to the time of disclosure; (ii)
> becomes publicly known and made generally available
> after disclosure through no action or inaction of
> Receiving Party; or (iii) is in the possession of Receiving
> Party, without confidentiality restrictions, at the time of
> disclosure by the Disclosing Party as shown by Receiving
> Party's file and records immediately prior to the time of
> disclosure.

(*Id.*) The NDA also makes clear that the parties are not to use Confidential

Information "for any purpose except to evaluate and engage in discussions

concerning a potential business relationship between the parties hereto." (*Id.*)

The NDA clearly contemplates the involvement of some third parties,

although in a very limited way. As noted above, the NDA covers information

*received from* third parties as part of the ongoing discussions between the Parties.

(NDA, Doc. 103-8 at 2 ("Confidential Information may also include information

*disclosed by* third parties at the direction of a Disclosing Party.") (emphasis

added).) This inclusion would prove necessary, as Caris at one point directs its

Pharmacy Benefit Manager, Optum, to share data to Brookside to allow Brookside to perform its analysis. But the NDA also expressly prohibits the sharing of information *to* a third party, where it says,

> Receiving Party agrees not to disclose any Confidential Information to third parties or to its employees, except to those employees who are required to have the information in order to evaluate or engage in discussions concerning the contemplated business relationship.

(NDA, Doc. 103-8 at 2.) As is plain and evident in the language used here, there are limited circumstances of acceptable disclosure to the employees of the Parties, but there are no circumstances in which disclosure of information to a non-employee third party is acceptable.

In the third paragraph of the NDA, the Parties agree to "take at least those measures that Receiving Party takes to protect its own most highly confidential information and shall have its employees, if any, who have access to Confidential Information sign a non-use and non-disclosure agreement in content substantially similar to the provisions hereof" before those employees receive any Confidential Information. (NDA, Doc. 103-8 at 2.) Again, it is notable that this section specifically mentions the extra measures to be taken with each Party's own employees, but it does not mention at all any potential third-party recipient of information otherwise.[8]

---

[8] The only other portion of the NDA that mentions an entity which might be construed in any way as a non-employee third party is the tenth and final paragraph, entitled "Miscellaneous." (NDA, Doc. 103-8 at 3.) In this paragraph, the Parties agree that the "Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns." (*Id.*) Of course, "successors and assigns" is a well-known legal phrase, and this inclusion does not affect the Court's reasoning

In the fourth paragraph of the NDA, the Parties agree that "[n]othing herein shall obligate either party to proceed with any transaction between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the business opportunity." (NDA, Doc. 103-8 at 2.) The Court notes that this portion of the NDA does not include any caveats or conditions, such as a notice period or formal method of termination.

As for remedies in the event of a breach, the NDA stipulates that the "Receiving Party agrees that any violation or threatened violation of this Agreement will cause irreparable injury to the Disclosing Party, entitling the Disclosing Party to obtain injunctive relief in addition all legal remedies." (NDA, Doc. 103-8 at 3.)

## VI.    Discussion and Analysis

The Complaint is this case includes just two counts: Breach of Non-Disclosure Agreement (Count I); and Unjust Enrichment (Count II). (Complaint, Doc. 1.) Summary judgment in favor of the Defendant is appropriate as to both counts for the following reasons.

### a.    Caris did not breach the NDA because the information it used was already known to Optum

---

herein. "[The term 'successor'] means, ordinarily in the case of a corporation, another corporation which by a process of amalgamation, consolidation, or duly authorized legal succession has become invested with the rights and has assumed the burdens of the first corporation." *S. Patrician Assocs. v. Int'l Fid. Ins. Co.*, 191 Ga. App. 106, 107 (Ga. Ct. App. 1989) (quoting *Hanna v. Florence Iron Co.,* 222 N.Y. 290, 118 N.E. 629, 631–632 (N.Y. 1918)). "[A] legal assignment is a transfer or setting over of property, or of some right or interest therein, from one person to another, and unless in some way qualified, it is properly the transfer of one whole interest in an estate, chattel, or other thing." *Id.* (Punctuation and citation omitted) (quoting *Hunter–Wilson Distilling Co. v. Foust Distilling Co.,* 84 F. Supp. 996, 1000 (M.D. Pa. 1949)).

27

The elements of a breach of contract claim in Georgia are (1) a valid contract; (2) material breach of its terms; and (3) resultant damages to the party having the right to complain that the contract has been broken. *See TechBios, Inc. v. Champagne*, 688 S.E.2d 378, 381 (Ga. Ct. App. 2009); *TDS Healthcare Sys. Corp. v. Humana Hosp. Illinois, Inc.*, 880 F. Supp. 1572, 1583 (N.D. Ga. 1995)). There is no dispute that the NDA was a valid contract.

Despite the voluminous briefing and production of evidence in this case, the dispute here boils down to the second element from above: did Caris breach the NDA when it renegotiated its contract with Optum after receiving Brookside's initial free consultation? Key to the Court's consideration are three discrete aspects of the NDA: (1) the definition of "Confidential Information"; (2) the meaning of the word "use" as it appears in the NDA; and (3) the meaning of "publicly known" information.

As discussed above, the definition of "Confidential Information" in the NDA is broad, but not necessarily all encompassing, including such categories of information as "documents, business plans, source code, software, documentation, financial analysis, marketing plans, customer names, customer list, [or] customer data." (NDA, Doc. 103-8 at 2.) The NDA specifies that the "Receiving Party agrees not to use any Confidential Information for any purpose except to evaluate and engage in discussions concerning a potential business relationship between the parties hereto." (*Id.*) The NDA does not separately define the term "use" so the Court assumes the word has its normal meaning and significance, which is "to put

into action or service: avail oneself of: employ." *Use*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/use; *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1238, n.6 (11th Cir. 2019) ("In Georgia, '[w]hen interpreting a contract, the language must be afforded its literal meaning and plain ordinary words given their usual significance,' and '[d]ictionaries may supply the plain and ordinary meaning of a word.'") (quoting *Grange Mut. Cas. Co. v. Woodard*, 861 F.3d 1224, 1231 (11th Cir. 2017)).

First, there is no genuine dispute that Caris did not literally use any of the materials Brookside presented to it on November 2nd. Caris was viewing the November 2nd presentation remotely via "Webex", and was not provided hard copies of the materials. (*See* Jim Benjamin Depo., Doc. 111 at 89 ("[Webex is] a way to share data without giving a hard copy to multiple participants and being able to speak while you're reviewing it.").) Nor is there any allegation that Caris attempted to screenshot or otherwise memorialize the presentation. (Jim Benjamin Depo., Doc. 111 at 90–91 ("I don't recall anybody ever saying that [anyone from Caris printed or took a screenshot of the presentation].") Beyond this though, Brookside cannot point to any instance in which Caris actually transmitted any of Brookside's work product or even conveyed to Optum or any other Pharmacy Benefit Manager Brookside's cost analysis and recommended strategy for Caris's leveraging of a more cost efficient contract with Optum or another Pharmacy Benefit Manager.

Caris contends that it did not even understand Brookside's presentation, let alone use any of the information that Brookside presented. (McRae Depo. Doc. 82

at 117 ("I never have understood Brookside's process, never. If they shared a model, I certainly didn't understand it.").) Indeed, the only information that Caris "used" from Brookside was the idea that its contract with Optum might stand to be improved.[9] (*See* McRae Depo. Doc. 82 at 115 ("Yeah, we were able to go to Optum, after meeting with others PBMs and saying Brookside says that we have a bad contract with you.").) But this is the exact post upon which Brookside hangs its hat: that the overall conclusion of its presentation – that "Caris has a bad contract with Optum" – was encompassed within the NDA's definition of confidential information, and that this is proven by Caris's course of action following the November 2nd presentation. The record emphatically demonstrates that after viewing the Brookside presentation, McRae and others undertook a process of research and analysis into their pharmacy costs. This included not only researching Brookside as a company and potential partner (such as calling Brookside's references and marking up the MSA and SOW from Brookside), but also researching pharmacy benefit managers other than Optum to learn more about whether Caris and Optum had at least an industry standard contract in place. It also included discussions with Optum directly, to explore options for altering the existing contract. Of course, it was through this latter option that Caris ultimately

---

[9] This much Brookside had been saying to Caris since the very beginning of their interaction, well before the November 2nd presentation or the execution of the NDA. It was the essence of Brookside's sales pitch. It was – at least until the point at which Brookside verified whether its method could actually produce any results – something akin to mere puffery, because, until that point, Brookside's characterization of Caris's contract as less than optimal was "not the sort of empirically verifiable statement that can be affirmatively disproven[.]" *Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1028 (11th Cir. 2003). Caris took away from the November 2, 2016 presentation only the idea that it would be worthwhile to look in to their Optum contract again.

decided to renegotiate its contract to utilize the pass-through pricing model that Optum had first suggested it use back in 2014.[10] This entire process was spurred into effect by the content of Brookside's November 2nd presentation.

What's more, it isn't just the knowledge of Brookside's conclusion that Caris uses. Caris used Brookside's name and potential involvement as a negotiation wedge. (Jan. 20, 2017 McRae Email to Saylor, Doc. 81-20 ("Tell [Optum] Brookside is anxious to get involved so they should hurry.").) Whether this played strongly or at all into the final renegotiation with Optum is not clear. But what is clear from the record is that within about three months of viewing the Brookside presentation, and having taken away from it at least that Caris had a suboptimal contract with Optum, Caris had reworked its contract with Optum, "saving nearly $500,000 in the first seven months of the renewed multi-year contract." (Brookside MSJ, Doc. 103 at 20.)

Brookside's theory of the NDA – and this case – is essentially that after Brookside made its presentation to Caris and shared its findings, Caris had the option to either: (1) hire Brookside to implement its findings and renegotiate (or help Caris renegotiate) a new Optum contract; or (2) sit on its hands until the expiration of its Optum contract. This might have been the case had Brookside insisted on Caris completing the MSA and SOW. But Brookside took a calculated risk in allowing Caris to proceed all the way to the presentation stage without

---

[10] Perhaps notably here, Caris did not utilize any of the strategies or particular information that Brookside would have suggested they use.

having the SOW and MSA executed and in place, banking on the friendly rapport

between Peter Benjamin and Norman McRae, as is evidenced in emails sent from

the Benjamin brothers to Norman McRae after the November 2nd presentation:

> Today you asked why our clients would sign our
> agreement after we detail the savings opportunity to
> them. I mentioned that we don't typically (in fact have
> never until this morning) shared the "road map" with our
> clients prior to executing our agreement. Our model
> squarely puts the risk on Brookside Group. However,
> implicit in knowing that our clients may not choose to
> engage us, is the notion that our clients won't use our "IP"
> to go to the vendor without us.

(11/02/2016 Email from Jim Benjamin, Doc. 103-11 at 2.)

> As for the question that I think came up today about "why
> would we share information before having a specific
> agreement", well, because I felt comfortable that we had
> shared the business model and because I know you[.]

(11/03/2016 Email from Peter Benjamin, Doc. 103-11 at 3.) Brookside banked so

hard on this rapport that they repeatedly promised a free consultation with no

obligation, likely hoping that Caris would be so impressed by the presentation that

they would then hire Brookside on in full. That didn't happen. Instead, throughout

the entirety of the interaction between the two, Peter Benjamin planted the idea in

Norman McRae's head that Optum was not providing the best possible contract

terms to Caris. McRae then took that idea and ran with it. To borrow from Jim

Benjamin's testimony, Caris "can't unknow something." (Jim Benjamin Depo.,

Doc. 111 at 166.)

The evidence submitted in the summary judgment record does not indicate or raise an inference that Caris actually *used* any of Brookside's proprietary analysis or pharmacy coding information when Caris performed market research into Pharmacy Benefit Managers and when it renegotiated its Optum contract. Nor does the record indicate that Caris opted to pursue the Maximum-Allowable Cost ("MAC") pricing model recommended by Brookside. (*See* Jim Benjamin Depo., Doc. 111 at 98 ("We told [Caris] that we felt, in the end, for them, that a MAC-based pricing agreement would be best.").) However, Brookside is correct that Caris likely would not have known that its contract with Optum was suboptimal if Brookside had not performed and presented its analysis. Although Caris did not *use* Brookside's actual analysis when it looked into improving its contract with Optum, Caris would not have begun to explore or renegotiate its Optum contract were it not for Brookside's presentation of its conclusion that Optum was overcharging Caris under the umbrella of their contract. In this way, Caris *used* the general conclusion of Brookside's presentation: that the Optum contract was costing Caris more than it should.

Having found that the evidence in the record undeniably shows that Caris used some information provided to it by Brookside, the Court moves on to ask whether such use violated the NDA. As noted above, the NDA clarifies that Confidential Information is *not*,

> any information which the Receiving Party can establish (i) was publicly known and made generally available in the public domain prior to the time of disclosure; (ii)

becomes publicly known and made generally available
after disclosure through no action or inaction of
Receiving Party; or (iii) is in the possession of Receiving
Party, without confidentiality restrictions, at the time of
disclosure by the Disclosing Party as shown by Receiving
Party's file and records immediately prior to the time of
disclosure.

(NDA, Doc. 103-8 at 2.) The NDA also makes clear that the parties are not to use

Confidential Information "for any purpose except to evaluate and engage in

discussions concerning a potential business relationship between [Brookside and

Caris.]" (*Id.*)

Jim Benjamin testified in his deposition that after Brookside had performed

its analysis, it came to the conclusion that Caris was spending too much on its

contract with Optum. (Jim Benjamin Depo., Doc. 111 at 77–78.) Jim Benjamin also

testified that he told Optum as much, *before* the November 2nd presentation to

Caris:

Q.   Okay. And at least, sitting here today, nothing
comes to mind more specific than what you testified to
with respect to conversations between Optum and
Brookside concerning Caris prior to November of 2016?

A.    I remember very specifically asking them to break
out the cost of cognitive services. [...]
        In the case of Caris, Optum's cognitive services also
included a, quote/unquote, dedicated pharmacist. And
we asked to dig into that so that we could understand it
because those costs were not broken out on invoice. They
were included in drug pricing.
        So during that month or so with Natalie [Swider]
and Laurie [Guay] [from Optum], we endeavored to put
a dollar amount on that since it was, quote/unquote,
buried in the drug price.

34

I also recall mentioning that their overall price was quite high relative to market.

Q.      Which call did you mention that? The early October or late October?

A.      Ninety-nine percent sure it was late October.

Q.      And what was their reaction to you saying that their pricing was quite high?

A.      They were aware that their pricing was quite high.

Q.      Okay. Do you remember anything that they said? What -- what did they say that led you to believe that they were aware that their pricing was quite high with respect to Caris?

A.      [...] And I believe, in that late October call, that either Laurie or Natalie also indicated that Caris liked the nature of their pricing methodology, and they were comfortable with it. And I asked if they knew that it was significantly above market, and I don't recall ever having a substantive answer to that.

Q.      Okay. But in any event, you put it out there to them that you -- you believed that their -- the pricing for Caris was significantly above market?

A.      I did.

(Jim Benjamin Depo., Doc. 111 at 78–79.)

Of critical importance here is the simple fact that the NDA does not define the phrase, "publicly known" as it pertains to information shared by either Party, or who exactly is the "public" being referenced to. Considering the context of the NDA – which is explicitly designed *only* to allow either of the two Parties to *receive* information about each other – the word "public" must include anyone other than

35

the Parties. That is, if on November 3rd Norman McRae went to get a haircut and told his *barber* everything that Brookside told Caris during the November 2nd presentation, Norman McRae would have violated the NDA. It would not matter much, as the barber would likely not be in a position to benefit from such information, but it would be a breach nonetheless. As the Court already discussed (*see, supra*, Section V.a.), the NDA cannot be read to say that either Party was permitted to share information *with* any third party. (NDA, Doc. 103-8 at 2 ("Confidential Information may also include information *disclosed by* third parties at the direction of a Disclosing Party.") (emphasis added).) Yet Jim Benjamin shared the high-level conclusion of Brookside's analysis with Optum *before* he shared the same with Caris.[11] Ay, there's the rub.

The information that Caris used in violation of the NDA was the high-level conclusion that Caris's contract with Optum was suboptimal, unduly costly, and above market. Caris would have been prohibited by the plain terms of the NDA from going to Optum with that piece of information without involving Brookside also in that discussion. Also per the plain terms of the NDA, there are only three scenarios in which Caris sharing that piece of information with Optum would not constitute a breach: if Caris can establish that the piece of information (i) was publicly known and made generally available in the public domain prior to the time

---

[11] As further discussed elsewhere in this Order, Brookside also shared information improperly with ST. (*See* Section IV.b.; *and* Section VI.b.) However, that improper disclosure weighed only in the Court's consideration of unjust enrichment, as Caris did not know of ST's existence until this litigation was well underway and does not claim to have suffered any actual damages as a result of that disclosure.

36

of disclosure; (ii) became publicly known and made generally available after disclosure through no action or inaction of Caris; or (iii) was in the possession of Caris, without confidentiality restrictions, at the time of disclosure by the Brookside. (*See* NDA, Doc. 103-8 at 2.) When Brookside shared the conclusion with Optum prior to sharing it with Caris, Brookside necessarily made that information "publicly known." By sharing the results of Brookside's analysis with Optum, Brookside not only breached the NDA,[12] but it also made that information known to parties outside of the reach of the NDA – the so-called "public." As a result, by the time that Caris "used" Brookside's confidential information, it was no longer confidential, and such use therefore was not a breach.

### b.    Caris did not unjustly enrich itself[13]

"Under Georgia law, '[t]he theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated.'" *Clark v. Aaron's Inc.*, 914 F. Supp. 2d 1301, 1309 (N.D. Ga. 2012) (*quoting Smith Serv. Oil Co. v. Parker*, 549 S.E.2d 485, 487 (Ga. Ct. App. 2001)). The "essential elements of the claim are that (1) a benefit has been conferred, (2) compensation has not been given for receipt of the benefit, and (3) the failure to so compensate would be unjust." *Id.*

---

[12] The Court notes that Brookside does not attempt to argue that its sharing of the conclusion of its analysis was somehow necessary to effectuate its receipt of information from Optum.

[13] The Court notes that the entirety of the portion of Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment which deals with unjust enrichment is within the portion of that brief that this Court has disallowed for failure to comply with page limitations. Accordingly, the Court has not relied at all on Defendant's Response, but has instead consulted Defendant's arguments on this topic within its own Motion for Summary Judgment.

A claim for unjust enrichment requires that the party conferring the benefit did so with the expectation of being paid. *Morris v. Britt*, 275 Ga. App. 293, 294 (Ga. Ct. App. 2005) ("For unjust enrichment to apply, the party conferring the labor and things of value must act with the expectation that the other will be responsible for the cost."); *Smith Development, Inc. v. Flood*, 198 Ga. App. 817, 820 (Ga. Ct. App. 1991) ("There can be no recovery for services rendered voluntarily and with no expectation at the time of the rendition that they will be compensated.") (quoting *Addison v. S. Ry. Co.*, 108 Ga. App. 314, 315–16 (Ga. Ct. App. 1963)). "Inherent in the theory of unjust enrichment is the requirement that the receiving party knew of the value being bestowed upon him by another and failed to stop the act or to reject the benefit prior to its conferment." *Hollifield v. Monte Vista Biblical Gardens, Inc.*, 251 Ga. App. 124, 131, 553 S.E.2d 662, 670 (Ga. Ct. App. 2001) (quoting *Reidling v. Holcomb,* 225 Ga. App. 229, 232, 483 S.E.2d 624, 626 (Ga. Ct. App. 1997)).

Unjust enrichment is inappropriate where the parties have a legal contract in place. The existence of the Business Associates Agreement and NDA are *arguably* inapposite to an unjust enrichment claim, but it is more likely the case that the MSA or SOW are the relevant agreements in the context of such a claim. *White Holding Co., LLC v. Martin Marietta Materials, Inc.*, 423 F. App'x 943, 946 (11th Cir. 2011) ("It is well settled that the law will not imply a contract where an express contract exists concerning the same subject matter.") (quoting *Kovtan v. Frederiksen,* 449 So. 2d 1, 1 (Fla. 2d Dist. Ct. App. 1984)). However, regardless of

whether the NDA or Business Associates Agreement might bar the claim (the Court does not believe they would), unjust enrichment is not appropriate here because Brookside repeatedly insisted that its initial consultation would be free and that Caris would be under no obligation to proceed. Brookside and Caris were both proceeding under the understanding that the presentation would act as a proof of concept sales pitch, and Brookside's greatest opportunity to convince Caris to enter into a contract for work by Brookside. (*See* McRae Depo., Doc. 82 at 121 ("My understanding was that they were providing free, no-risk services to us, and if we were to come to an agreement, then, yes, I believe they would expect to be paid, but we never came to an agreement. There was no agreement, implied or otherwise.").) If Brookside expected to be paid by Caris, it was for the work that was to come next. There is simply no evidence whatsoever before the Court to support the contention that Brookside was expecting to be compensated for the information it parlayed during the November 2nd presentation. To the contrary, Brookside had repeatedly assured Caris that the initial portion of its consultation was free. Furthermore, Caris did not know the potential value being bestowed upon it by Brookside, as evidenced by their pursuit of due diligence to research their Optum contract, and their ongoing negotiations with Brookside towards potentially engaging them in a full contractual relationship. *See Hollifield*, 251 Ga. App. at 131.

Caris asserted the affirmative defense of unclean hands in its Amended Answer, arguing that Brookside violated the NDA when it shared Caris's

confidential information with ST, and therefore cannot assert a claim of unjust enrichment. (Amended Answer, Doc. 63 at 11; Caris MSJ, Doc. 114-1 at 35 (citing *Hollifield*, 251 Ga. App. at 131; and *Eichholz Law Firm PC v. Jeff Martin and Associates, P.C.*, No. CV414-172, 2016 WL 4492855, at *5 (S.D. Ga. Aug. 25, 2016) ("However, the doctrine of unclean hands operates to bar equitable recovery like unjust enrichment and quantum meruit.")).) The Court would tend to agree that sharing information with ST was clearly not allowed by the plain terms of the NDA, and Brookside's relationship with ST does not alter that fact. The NDA plainly contemplated only the receipt of information from third parties, and Brookside's sharing of Caris and Optum's confidential information was a clear breach of the NDA. "When a party comes into court with unclean hands, equity will not grant relief to such party." *Hollifield*, 251 Ga. App. at 127 (citing *Head v. Walker,* 243 Ga. 108, 110, 252 S.E.2d 440 (Ga. 1979)). However, for a Defendant to successfully avail itself of the affirmative defense of unclean hands, it must satisfy two requirements. *Calloway v. Partners Nat. Health Plans,* 986 F.2d 446, 450–51 (11th Cir. 1993). "First, the defendant must demonstrate that the plaintiff's wrongdoing is directly related to the claim against which it is asserted." *Id.* (citing *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245 (1933)). "Second, even if directly related, the plaintiff's wrongdoing does not bar relief unless the defendant can show that it was personally injured by her conduct." *Id.* (citing *Mitchell Bros. Film Group v. Cinema Adult Theater,* 604 F.2d 852, 863 (5th Cir. 1979), *cert. denied,* 445 U.S. 917 (1980).

The first element of Brookside's claim for unjust enrichment is premised on Caris's alleged violation of the NDA by using Brookside's confidential and proprietary information for Caris's own benefit. Therefore, Brookside's own violation of the NDA would be "directly related to the claim" it seeks to assert against Caris here. *Calloway,* 986 F.2d at 450–51. However, Defendant cannot satisfy the second requirement, because it simply does not address or attempt to satisfy the second requirement of actual injury whatsoever. Therefore, the affirmative defense is inadequately pleaded and demonstrated and would not serve to bar the unjust enrichment claim, although that claim has failed for the reasons discussed *supra*.

## VII. Conclusion

Plaintiff's Motion for Leave to File Matters Under Seal **is GRANTED in part** and **DENIED in part** subject to the specifications discussed in this Order. [Doc. 104.]

Plaintiff's Motion for Partial Summary Judgment as to Liability is **DENIED**. [Doc. 102.]

Defendant's Motion for Summary Judgment is **GRANTED in PART** as to both counts in Plaintiff's Complaint, and **DENIED in PART** as to the Doctrine of Unclean Hands. [Doc. 114.] **The Court's denial of Defendant's unclean hands defense, however, does not impact the Court's ultimate determination that summary judgment against Plaintiff as to Counts I and II should be GRANTED.**

Defendant's Motion for Leave to File Briefs in Excess of the Page Limits is **GRANTED in part** as to its Motion for Summary Judgment (Doc. 114), but **DENIED in part** as to its Response to Plaintiff's Motion for Partial Summary Judgment (Doc. 124). [Motion, Doc. 132.]

Plaintiff's Motion for Leave to File Sur-Reply is **DENIED**. [Doc. 145].

The Clerk of the Court is **DIRECTED** to close this case.

**IT IS SO ORDERED** this 4th day of March, 2021.

_Amy Totenberg_
**Amy Totenberg**
**United States District Judge**